UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____x

IN RE EVCI COLLEGES HOLDING                          05 Civ. 10240 (CM)
CORP. SECURITIES LITIGATION                          Lead Case


_____x


DECISION AND ORDER DENYING MOTION TO DISMISS
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

McMahon, J.:

        The passage of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C.§ 78u-
4(b) – a statute designed to eliminate proven abuses of the securities class action
process – has led to some tension between that Act and the ordinary rules applicable to motions
to dismiss federal complaints. The PSLRA imposes heightened pleading standards on plaintiffs
in securities class action suits. If read too literally, the statute would appear to impose on a
securities plaintiff the almost insuperable burden of having to file a complaint that is as
comprehensive as his closing argument after trial.

        This tension is front and center in the instant motion to dismiss plaintiffs' amended
complaint. The defendants – EVCI Colleges Holding Corp. and three of its former
officers/employees – contend that plaintiffs have failed to meet the heightened pleading
requirements of Fed. R. Civ. P. 9(b) and the PSLRA, despite filing a 203 paragraph amended
complaint that lays out extensive information about (1) a scathing New York State Education
Department ("SED") report, which revealed highly questionable admissions practices at EVCI;
and (2) the results of counsel's private investigation, using confidential informants who, by
virtue of their positions with EVCI, had reason to be able to confirm the abuses identified by the
SED. Defendants also argue that plaintiffs  have not sufficiently pled the scienter required to
make out a securities fraud violation by the individual defendants.

        Plaintiffs counter that they have more than met their burden at the pleading stage on both
counts.

        The PSLRA's effort to weed out strike suits was well-intentioned. Unfortunately, the
statute does not protect courts from the defense equivalent – a "strike" motion to dismiss that is
utterly lacking in merit. If ever a complaint was well-pleaded under the PSLRA, this one is; if
ever a motion to dismiss was utterly lacking in merit, it is this one.

        The motion is denied.

**Standard for Determining the Motion**

Even under the PSLRA, the usual rules for determining motions to dismiss pertain: the well-pleaded allegations of the complaint are deemed true and all inferences are drawn in favor of the pleader. The court is not to weigh the merits of the case on a motion to dismiss or to engage in fact-finding. "While Congress has acted to discourage the filing of strike suits, nothing Congress has done suggests that the general principles of a motion to dismiss are no longer applicable in securities fraud cases." In re Independent Energy Holdings PLC Securities Litigation, 154 F. Supp. 2d 741, 747-48 (S.D.N.Y. 2001)(*abrogated on other grounds by* In re Initial Public Offering Sec. Litig., 241 F. Supp. 2d 281 (S.D.N.Y. 2003). "Even under the enhanced pleading standards for Rule 10(b) claims set forth by the PSLRA, the standard for granting a motion to dismiss . . . for lack of a claim upon which relief may be granted is still high." Babaev v. Grossman, 312 F. Supp. 2d 407, 410 (E.D.N.Y. 2004).

The gloss imposed by the PSLRA involves what allegations can be deemed "well pleaded." In addition to the long-standing requirements of Fed. R. Civ. P. 9(b) which requires the plaintiffs to state "the circumstances constituting fraud.....with particularity," the PSLRA requires them to "state with particularity all facts on which [information and belief that defendants have violated Rule 10(b)(5)] is formed." 15 U.S.C. § 78u-4(b)(1). The Second Circuit has ruled that the word "all" as used in the PSLRA means that plaintiffs must plead "sufficient" facts to support a reasonable belief as to the misleading nature of defendants' statements or omissions. Novak v. Kasaks, 216 F. 3d 300 (2d Cir. 2000).

**The Allegations of the Amended Complaint**

The issue raised on this motion is whether plaintiffs have pleaded "sufficient" facts to support their asserted belief that there was pervasive fraud in the admissions process at EVCI's Interboro College – the institution that generated nearly all of EVCI's revenue during the asserted class period (August 2003 through December 2005). Defendants, parsing each individual allegation, urges the court to find that none of them, taken individually, is sufficiently supported by a factual underpinning. Plaintiffs, viewing the complaint as a whole, argue that the big picture includes sufficient factual allegations to warrant denial of the motion at the pre-discovery stage.

Here, in a nutshell, is what the amended complaint pleads:

EVCI is a holding company. Organized in 1997 and public since 1999, EVCI provides on-campus career two year college education through three subsidiaries: Interboro, Technical Career Institutes, Inc., and Pennsylvania School of Business, Inc. Its principal asset is Interboro, which generates the bulk of EVCI's revenue. That revenue has grown substantially, from $8.6 million in 2000 to $50.4 million in 2005.

Dr. Arol Buntzman was a founder of EVCI and has chaired its Board of Directors since

2

the school's inception. He served as EVCI's Chief Executive Officer from March 1998 until December 2002.

Dr. John McGrath, another founder of EVCI, has served as President of the corporation since its inception and since January 1, 2003 has been its Chief Executive Officer. He sits on the corporation's Board.

Richard Goldenberg is a director of EVCI and served as its Chief Financial Officer between March 1997 and October 2005.

Interboro is a two year college. It was conditionally accredited by the New York State Board of Regents on June 9, 2003. EVCI purchased Interboro on January 14, 2000. Interboro's students are primarily minority students from economically disadvantaged backgrounds; 85% or more lack a high school diploma or GED. They are able to attend a college only by passing a federally approved ability-to-benefit ("ATB") examination, and by obtaining financial assistance through federal and state grants: Pell grants and New York State Tuition Assistance Program ("TAP") grants. Interboro's student body consists of a higher percentage of ATB students than almost all other colleges or universities whose students receive Pell and TAP grants, and Interboro does not charge tuition in excess of the amount received from those grants. In other words, Interboro's revenues derive in substantial part – 94%, to be precise –  from publicly funded education grants awarded to students who are both poor and poorly prepared for higher education. And EVCI, in turn, derives nearly all its revenue from Interboro.

As a commercial college that admits nearly all its students through ATB entry tests, Interboro is subject to strict regulation and intense scrutiny from state and federal regulators. In particular, accreditation is a prerequisite for participation in the Pell and TAP grant programs that give EVCI the bulk of its revenue. Throughout the Class Period, Interboro's accreditation was "conditional," and was dependent on, among other things, Interboro's ability to (1) increase its ability to retain students, not just enroll them; (2) attain a graduation rate of at least 25% for classes entering in the fall of 2001, and increasing thereafter; (3) address issues surrounding teaching load and class size; and (4) provide appropriate print collection at the library facilities at all Interboro locations.  Interboro was required to provide an updated and revised "institutional effectiveness plan" by January 30, 2004, and to submit a mid-point accreditation self-study in the spring of 2006. Interboro also had to comply with standard minimum level of quality required by the State to obtain and maintain institutional accreditation. And the ATB testing process was highly regulated; federal regulations required that the tests be administered by professionally-trained independent test administrators who are not students or former students.  Test procedures also had to be secure so that test results would not be compromised.

Interboro also needed state approval to open sites as extension centers (satellite sites enrolling 35 students or more). Without extension centers, enrollment possibilities were limited. Since Interboro's (and by extension EVCI's) income was directly proportional to the amount the school received from the Pell and TAP programs, more students meant more money. Interboro had extension sites approved in Flushing (2001) and Washington Heights (2003).

Defendants were aware, throughout the class period, that Interboro's failure to comply with the state and federal regulations governing Interboro's operations would subject EVCI to adverse consequences, including limits on growth and a denial of re-accreditation. EVCI disclosed as much in its Form 10-KSB for March 23, 2005.

Throughout the class period, EVCI reported to the investing public that Interboro's enrollments were increasing at a significant rate and that the company's revenues were increasing dramatically as well. As reported by EVCI, enrollments and revenues increased between 15 and 85 percent every quarter compared to the previous year's corresponding quarter. Defendants attributed this growth to "carefully developed strategies....designed to meet the unique needs of economically disadvantaged students" and to Interboro's "greater retention of existing students." (Cplt. ¶ 41)

As a condition for obtaining approval for the Washington Heights extension site, Interboro agreed to implement additional screening mechanisms for applicants that were specifically designed to enhance quality control and lead to a lower percentage of admitted students. Interboro acknowledges that this would have "significant budgeting, planning, scheduling and revenue implications for the college."(¶ 59). Although the agreement referred to a lower "percentage" of admitted students, the State's emphasis on quality control necessarily meant that this new screening mechanism would lead to a lower "number" of students – an expectation driven home by the SED's insistence that, "We expect this *reduction in admitted students* to continue until the Institution's graduation rate reaches 25 percent and remains at that percentage for two years or higher. (¶ 58).

In September 2004, Interboro applied for extension center status for its Yonkers location. The SED responded by noting that Interboro had been operating Yonkers as an extension center before the application was submitted, in violation of state law and contrary to Interboro's representations – a defalcation to which Interboro quickly admitted. (¶ 63). The SED also questioned certain discrepancies and deficiencies in Interboro's submissions regarding enrollments, retention and performance data.  In a letter dated December 6, 2004, the SED notified Interboro's President, Stephen Adolphus, that the state would not approve Yonkers as an extension center if it concluded that Interboro did not have the capacity to expand.

In an initial assessment of Interboro's facilities dated June 15, 2005, the SED concluded that Interboro did not have the capacity to expand, the SED found inadequate library facilities at Yonkers, Washington Heights and the main campus in Manhattan, and generally inadequate facilities in Washington Heights. The SED also noted that Interboro's "persistence" (i.e., student retention) "is not improving, but is getting worse." The SED concluded its letter evaluation with the following words: "Given the current deficiencies, the State Education Department will not approve Yonkers as an extension center . . . the Institute is overextended in its ability to effectively serve the students it enrolls. However, the Department will be open to entering into conversations with the Institute with respect to agreeing upon an appropriate number of students that the Institute can serve given the educational needs of the students and the state of the facilities and services currently available." (¶ 65). However, the SED did not take immediate

4

steps to close down the illegally-opened and inadequately-maintained extension center.

EVCI did not disclose that, based on the SED's  December 2004 threat and its adverse findings, Yonkers had not been approved as an extension site. Instead, EVCI represented that the SED "may" withhold approval of Yonkers.

The following month, on October 7, 2005, Interboro received a Draft Report from the SED. The Report chronicled fraudulent practices with respect to Interboro's admissions and financial aid processes. Using undercover operatives posing as potential applicants, the State found that one apparent applicant was encouraged to lie about his income in order to qualify for financial aid; at least three investigators who had purposely failed the ATB test, were told that they had passed and that Interboro had changed their answers to achieve the passing grade; two of those three operatives had been handed test booklets marked to indicate the correct answers.

The SED Draft Report was accompanied by a terse Draft Letter, in which the State expressed "serious concerns" about admissions processes and student support services, porous or incomplete quality assurance at the instructional level; lack of faculty participation in institutional governance; and inadequate library facilities.

On October 19, 2005, EVCI disclosed some of the State's findings. Its stock immediately plummeted more than 50% from the previous day's close, and volume rose from 29,000 shares the day before to 3.65 million shares. Analysts downgraded EVCI's stock.

On November 3, 2005, EVCI, responding to the draft report, agreed to cease expansion and cap enrollment at the fall 2005 level.

EVCI also responded to the draft report by asking the Audit Committee of the Board to conduct an investigation into the SED's allegations. The Audit Committee's regulatory counsel confirmed admissions irregularities, though counsel concluded that the irregularities were the work of a few employees and were not pervasive. Counsel's report exonerated the company's management, concluding that they were ignorant of these defalcations. These results were disclosed on November 22, 2005.

On December 6, 2005, EVCI filed a Form 8-K attaching the SED's final report. A cover letter attached to the final report noted that defendant's own internal investigation had "affirm[ed] some of the findings of misconduct of the Department's investigation" and was "not able to refute any of the findings in the Department's report" – findings that included alteration of test sheets, encouraging a prospective student to lie on a financial aid application, and a "total disregard for administering the ability-to-benefit examination with integrity at the Flushing campus." Interboro was found to be "significantly out of compliance" with the SED's Regulations for operating credit-bearing programs in New York, and the SED ordered the institution to reduce enrollment at all of its campuses. Moreover, the final report concluded that Interboro had made no changes whatsoever to address the defalcations identified nine months earlier, in the Comptroller's report of audit (March 2005).

EVCI's stock fell by another third (from $2.60 to $1.80), and the volume of shares traded skyrocketed (from 154,000 to 2.1 million), as soon as these additional disclosures were made.

The first of the lawsuits that are the subject of this motion was commenced almost immediately.

In addition to relying on the above information, plaintiff's counsel conducted an investigation that involved interviewing persons who are or were formerly associated with Interboro. The amended complaint reveals the results of that investigation, which contradict in substantial part the Audit Committee's conclusions that the fraudulent admissions practices were confined to a few rogue employees and were unknown to management. A former dean at Interboro (Confidential Witness #1), reported that McGrath, upon becoming the Chief Executive Officer of EVCI,  ordered admissions increases of at least 20% every semester over the prior semester. Two former Admissions Officers (Confidential Witnesses #2 and #3) reported that McGrath ordered Admissions Officers to enroll 120 new students per semester or face termination – and that Admissions Officers were in fact fired for not meeting the quota. The three confidential witnesses advised plaintiff's counsel that it was common knowledge that Interboro was not complying with federal regulations for ATB testing and that test answers were being changed to pass applicants into the school. Another Confidential Witness (CW#5) revealed that students were used to grade ATB tests, in violation of the regulations, and that both student graders and full-time Admissions Office employees changed answers. CW #5 also told plaintiff's counsel that Interboro Admissions Officers paid bribes (in the form of money or Interboro merchandise) to student graders to get them to pass applicants. All of these allegations are found in the amended complaint.

The amended complaint also alleges that the United States DOE conducted a review of Interboro's compliance with respect to approximately $26 million in Title IV grants made to the school's students during the school years 2002-03, 2003-04 and 2004-05. As a result of its investigation, which uncovered instances of misgrading ATB exams, DOE demanded that Inerboro rescore all ATB tests administered during the three years reviewed. EVCI estimated that Interboro would be liable to repay approximately $1.3 million of Title IV funds to DOE, which would put EVCI out of compliance with the terms of its existing bank debt and would permit the bank to accelerate the Company's outstanding loans, which would have a materially adverse financial impact on EVCI.

**The Complaint More Than Meets the Standards of the PSLRA and Rule 9(b)**

As the detailed recital set forth above makes clear, plaintiffs have pled more than sufficient facts to give them a basis for alleging that there was pervasive fraud in Interboro's admissions process.

A pleader can satisfy the PSLRA by citing documentary evidence or by relying on generally described personal sources. Novak v. Kasaks, 216 F. 3d 300, 314 (2d Cir. 2000). In this case, plaintiffs have done both.

The amended complaint identifies more than thirty public statements made by defendants during the class period that are alleged to have been false or misleading in that they failed to disclose the following material information. Each statement is followed by a paragraph identifying precisely what facts defendants knew but failed to disclose when the statement was made.

*1. Allegations Relating to Admissions Practices and Tuition Grants*

Plaintiffs identify documentary bases for their allegations of fraudulent admissions practices. The principal documentary sources are Government reports: the Draft Report of the New York State Department of Education, which conducted an investigation and accused Interboro of violating regulations, suborning perjury and engaging in fraudulent admissions practices; and a finding by the United States Department of Education concerning Interboro's misgrading of ATB exams and wrongful admission of students. The published results of a governmental investigation offer perhaps the strongest possible documentary support for the allegations of wrongdoing contained in the complaint. Additional documentary sources are identified, including correspondence between EVCI/Interboro and the SED.

The allegations based on information received from the confidential witnesses are well-pleaded. The identity of a confidential informant does not need to be disclosed in a complaint in order to satisfy any requirement of the PSLRA; the pleader needs only describe the confidential sources with sufficient particularity to support the probability that someone in such a person's position would be privy to the information alleged. Novak, supra., 216 F. 3d at 313-14; In re Veeco Instruments Securities Litigation, 235 F.R.D. 220, 229 (S.D.N.Y. 2006); Whalen v. Hibernia Foods PLC, 2005 WL 1799379 at *4 (S.D.N.Y. August 1, 2005).

The amended complaint identifies the confidential sources as a Dean and two Admissions Officers and a student who worked in the Admissions Office at Interboro. Defendants impugn their credibility by adverting to the results of the Audit Committee's investigation, but at the pleading stage the issue is not whether these confidential witnesses are telling the truth. It is whether there is a probability that they know what they are talking about. It is highly probable that persons employed in the admissions office – both individually and, collectively, at every level in the office – are privy to details about the admissions process that they administer and implement. They are also well-positioned to attest to the participation of the individual defendants in promoting fraudulent admissions practices.  That their evidence is consistent with the SED's and DOE's findings only bolsters their reliability as the source for plaintiffs' information and belief. Moreover,  the allegations based on these witnesses' statements are anything but conclusory – they are detailed and specific about the practices that were fraudulent.

Defendants' effort to discount the statements of the confidential witnesses by claiming that at least some of the actions they describe are not inherently wrongful is misguided at this stage of the proceedings. Plaintiffs have alleged sufficient facts to support their contention that defendants were engaged in an ongoing fraudulent scheme to inflate the size of revenues by admitting unqualified or ineligible students who would then obtain federal or state tuition grants.

Such a scheme, like any conspiracy, could be advanced through activities that would in other contexts be perfectly lawful. Whether defendants engaged in questionable practices is a question of fact that will have to abide a trial. It is manifestly unsuited for resolution on a motion to dismiss. So is the issue of whether admissions fraud was "isolated," as defendants claim, or was widespread, as plaintiffs allege with the support of the confidential witnesses. And so is the issue of whether New York State disallowed TAP funding to Interboro students in error or because of a real problem with Interboro's admissions process.[1]

### 2. Allegations Relating to Student Retention Rates

The amended complaint also contains sufficient factual support for the allegation that EVCI wrongfully failed to disclose that Interboro's growth was not due to improved student retention – indeed, that its retention strategies were failing – but rather to increased enrollments. The SED's Draft Report concluded that Interboro's graduation rate had not increased, and in some cases had decreased. Defendants dispute this allegation as a matter of fact, but whether EVCI or the SED is correct in this regard is a question of fact unsuited for resolution on a motion to dismiss. Furthermore, the issue is not simply whether graduation and retention rates increased during the Class Period, but whether they met the SED's standards. According to the SED, they did not.

### 3. Allegations Relating to Student Support

The amended complaint contains sufficient factual underpinning for the allegation that EVCI wrongfully failed to disclose that Interboro was unable to provide adequate support for its student body, thereby jeopardizing its accreditation. Again the source document is the SED Draft Report, which asserted that the school's facilities and libraries were inadequate, its instructional quality "porous," and its student support services and computer workstations "insufficient." The SED singled out Interboro's main campus and its Washington Heights location as not being "adequate in scope, condition and services to support the current level of enrollment at each of these locations." Defendants argue that the Draft Report also contained "numerous positive findings." However, this court is unable to conclude that deficiencies in facilities, libraries, instructional quality and student support would be immaterial to someone who was thinking about investing in the corporate owner of an educational institution with those particular deficiencies.

---

[1] The amended complaint does not contain detailed allegations about the New York State Comptroller's audit of Interboro's compliance with state law in connection with the TAP program, but the court is aware, from its familiarity with the shareholder derivative suit that has been consolidated with this action for purposes of discovery, that the Comptroller issued an audit report in March 2005 that concluded that Interboro had obtained nearly one million dollars in TAP monies wrongfully during the 200-01 and 2002-03 school years. This finding will no doubt become an issue in the class action suits.

*4. Allegations Relating to Reducing the Number of Students at Interboro*

The amended complaint contains more than adequate factual underpinning for the allegation that Interboro agreed to reduce enrollments as early as March 2004. On or about March 23, 2004, the SED wrote a letter to Interboro, which says the following: ". . . result in your accepting a lower percentage of students. We expect this reduction in admitted students to continue until the Institution's graduation rate reaches 25 percent and remains at that percentage for two years or higher."  In a letter anticipating the March 23 missive, Interboro wrote to the SED, stating that its agreement concerning a reduction of some sort in admissions would have "significant budgeting, planning, scheduling and revenue implications for the college."

Plaintiffs read this correspondence as indicating that Interboro agreed to admit a smaller number of students. Defendants read it as indicating that Interboro could continue to admit increasing numbers of students, only at a lower rate. The letter from SED can fairly be read both ways. A jury will have to resolve the point. However,  plaintiffs' allegation has the documentary support needed to pass muster under the PSLRA at the pleading stage.

Similarly, plaintiffs' argument that EVCI wrongfully characterized the SED's position on the granting of extension status to the Yonkers facility in its October 19, 2005 disclosure is supported by the contents of the Draft Report, which stated, "Interboro's application for an extension center in Yonkers *is denied*, therefore, Interboro *must cease all enrollment at Yonkers* until such time as it is operating within the regulatory limitations for this extension site." (Emphasis added). Defendants claim that they did not need to disclose this statement because the report was a draft. This ignores the fact that the Yonkers site had been operating illegally, that the SED had indicated its intent not to grant extension status to the site some four months earlier; that the SED had stated it would not authorize the Yonkers extension if Interboro proved unable to support additional expansion some ten months earlier;  and that the Draft Report can be fairly read as directing Interboro to close down the Yonkers operation immediately pending regulatory approval. Again whether plaintiffs' or defendants' interpretation of the language in the Draft Report is the correct interpretation must abide a trial. Plaintiffs' reading of the Report is certainly logical; the complaint therefore complies with the PSLRA's pleading requirements.

* * * * * * * * * * *

All in all, the pleading before the court  is one of the best supported securities fraud complaints this court has seen in the eleven years since the PSLRA was passed. If this complaint does not pass muster, I cannot imagine what would qualify as an adequate pleading. The motion to dismiss the complaint for failure to plead with the particularity required by Rule 9(b) and the PSLRA is denied.

**The Amended Complaint Raises a Strong Inference of Scienter**

The requisite state of mind in a Rule 10b-5 action is "intent to deceive, manipulate, or defraud." <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 193 n.12 (1976). Scienter can be alleged in

two ways: by pleading facts that evidence conscious misbehavior or recklessness or by pleading facts that evidence defendant's motive and opportunity to commit fraud. Kalnit v. Eichler, 264 F. 3d 131, 139 (2d Cir. 2001). Again, at the pleading stage, the plaintiff is not required to prove his case; only to raise a reasonable and strong inference of scienter. In re Regeneron Pharmaceutical Securities Litigation, 2005 WL 225288 at *24 (S.D.N.Y. Feb. 1, 2005).

In this case, the amended complaint alleges facts constituting strong circumstantial evidence of conscious misbehavior or recklessness, at least as to defendants McGrath and Goldberger.

As to McGrath, the amended complaint is more than sufficient in this regard, since he is identified by several sources who were in a position to know as the architect or instigator of the fraudulent admissions policy that lies at the heart of the case. Moreover, he was the Chief Executive Officer of EVCI when Interboro illegally opened the Yonkers extension site. He either knew or should have known about the precariousness of Yonkers' position and that Interboro was not in compliance with Regents and the SED's standards for retention and graduation, as well as sufficiency of facilities. He also was or should have been aware that the SED had ordered Interboro to decrease the number of students enrolled (an allegation that I accept as true for the purposes of this motion).

Goldberger, too, as Chief Financial Officer throughout the relevant period, had to have been aware of the SED investigation, the TAP audit and the U.S. Department of Education inquiry, since all of these impacted, or had the potential to impact, EVCI's bottom line. The company's management knew that there were standards for accreditation and for participation in the Pell and TAP financial aid programs and were responsible for ensuring that Interboro complied with regulatory mandates. As is detailed above, the amended complaint adequately alleges that the school was significantly out of compliance with those regulatory mandates for a substantial period of time. Indeed, the circumstantial evidence of conscious misbehavior or recklessness on the part of both of these individuals is overwhelming.

In view of the foregoing, it is not necessary to consider whether the complaint adequately alleges that McGrath and Goldberger has the motive and opportunity to commit fraud, or to engage at this point in an analysis of their shareholdings and sales.

The allegations with respect to Buntzman, EVCI's Founder and Chairman, are harder to analyze. There is no allegation that Buntzman was in day-to-day control of the corporate operations of EVCI/Interboro during the class period. However, he was the Chairman of the Boards of both EVCI and Interboro, and was the Chancellor of Interboro from and after January 1, 2003. Buntzman also signed each of EVCI's Forms 10-KSB filed with the SEC and was one of the company's principal spokesmen.

The amended complaint alleges that Buntzman was one of the largest shareholders of EVCI during the class period. It also alleges that he sold 300,000 shares of EVCI on November 12, 2003, in violation of an interim court order limiting the transfer of his assets issued in

10

connection with his matrimonial case. (¶ 181). And it alleges that he sold another 310,000 shares (out of 385,361 owned) on April 2, 2004 – less than two weeks after EVCI received a letter from the SED confirming that Interboro had to implement measures designed to admit fewer students, measures that Interboro admitted would have "significant . . . revenue implications for the college." Plaintiff argues that the amount of stock sold as a percentage of Buntzman's holdings taken together with the timing of the April transactions and the fact that McGrath and Goldberger sold substantial amounts of their EVCI stock at the same time, would enable a reasonable juror to conclude that Buntzman had a motive and opportunity to commit securities fraud.

Defendants argue two things in response: that Buntzman's sales as a percentage of his holdings is actually less than plaintiffs argue, because plaintiffs did not take into account vested stock options. They also contend that the timing of the April 2, 2004 stock sales had an innocent explanation: defendants sold more shares so that additional shares would be available for an oversubscribed private placement..

The Second Circuit has not yet opined on whether vested options should be counted as shares when calculating an individual's stockholdings. Two of my colleagues are in disagreement with each other. See In re Espeed, Inc. Securities Litigation, No 05 Civ. 2091 (SAS), 2006 WL 880045 (S.D.N.Y. April 3, 2006) (vested stock options should be counted as shares) and In re Oxford Health Plans, Inc., Sec. Litig. 187 F.R.D. 133, 140 (S.D.N.Y. 1999)(vested options are not shares).  On the whole, I am more inclined to follow Judge Brieant's view, as expressed in Oxford, that vested but unexercised options are not shareholdings. If one adopts that view, then Buntzman sold 80% of his stock in April 2004, after having sold almost 50% of his shares the previous November.

However, regardless of which side of that debate one comes down on, Buntzman sold far too much stock in April 2004 to wriggle out from a fair inference of motive and opportunity to committed fraud:  more than 41% of his stock if his options are counted, 80% if they are not. Coupled with the other facts cited above,  it is easy to conclude that the complaint sufficiently alleges scienter as to Buntzman. Stevelman v. Alias Research, Inc., 174 F. 3d 79, 82, 85 (2d Cir. 1999). The fact that there might be an innocent explanation for the timing of Buntzman's sale is not enough to defeat the inference of scienter that arises from plaintiffs' well-pleaded allegations – which, as defendants keep forgetting, I must accept as true for purposes of this motion to dismiss. It is for a jury to decide whether beneficence toward the participants in the private placement or a desire to get out while the getting was good motivated Buntzman and his compatriots to sell down their holdings so dramatically when they did.

**Defendants are Not Entitled to the PSLRA's Safe Harbor Protection**

Defendants contend that their statements qualify for safe harbor treatment because their statements were either "forward looking" or, when they were not, contained meaningful cautionary language. Plaintiffs argue that any cautionary language was not meaningful and that the PSLRA provides no protection for statements that the defendants knew to be false when

made.

Under the PSLRA's Safe Harbor Provision, 15 U.S.C. § 78u-5(c), management cannot be held liable for making "forward-looking" statements, which are in the nature of predictions, as long as those statements are accompanied by "meaningful cautionary language."

Forward-looking statements include:

– statements containing projection of revenues, income (loss), earnings (loss) per share, capital expenditures, dividends, capital structure or other financial items;

– statements about plans and objectives of management for future operations;

– statements about future economic performance

– statements about the assumptions underlying or relating to any of the above.

The court agrees with plaintiffs that many of the allegedly false statements made by EVCI are not "forward looking," in that they simply discuss current conditions at Interboro. The August 14, 2003 press release simply announced the corporation's first half earnings and attributed the increase to "new student enrollments, increased retention and the addition of new college sites." The November 12, 2003 press release announced defendant Buntzman's sale of stock. The November 14, 2003 press release and concomitantly filed Form 10-QSB announced third quarter earnings, attributed improved results to "increased college enrollments" (up over 30%), and expressed "delight" over the record enrollment as a "response to our carefully developed strategies which are designed to meet the unique needs of economically disadvantaged students." The press release also discussed "a dramatic reduction in the drop-out rate during the first few weeks of the quarter." (See Am Cplt ¶¶ 102, 108, 110, 112). Plaintiffs allege that these fact-based announcements were not accompanied by any revelation that Interboro's "carefully developed strategies" included admissions fraud and that the college did not have any "carefully developed strategies" in place to assist and support the many economically disadvantaged students who were enrolling.

Defendants argue that numerous items that plaintiffs claim they should have disclosed did not need to be disclosed. For example, plaintiffs allege that defendants did not disclose that their admissions process included questionable practices such as altering test scores and encouraging prospective students to lie on financial aid applications to make candidates appear eligible for admission. Defendants argue that this information did not need to be disclosed, pointing out that, "A corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." In re Time Warner Inc. Sec. Litig., 9 F. 3d 259, 267 (2d Cir. 1993). However, as defendants also note, a duty to disclose information arises whenever it is necessary to disclose a fact to prevent another statement from being misleading. In this case, the disclosure about any fraud in the admissions process (assuming, as I must, that plaintiffs' allegations in this regard are true) would have been absolutely necessary to make

EVCI's statements about enrollment increases and growth strategies not misleading.

Rather than discuss the many other non-forward-looking statements that are cited in the complaint, I refer the reader to the following paragraphs of the amended complaint: 116, 118, 124, 130, 142, 144, 150, 154, 158, 161, 165, 167. The Safe Harbor doctrine would not apply to any of these statements of existing fact.

I also disagree with defendants' argument that, as a matter of law,  EVCI had no duty to disclose details regarding the SED Review of the Yonkers site before receiving the Draft Report. The Yonkers site was opened illegally, and the SED indicated in writing, as early as June 2004, that the site was not going to be approved. It is premature on a motion to dismiss to conclude that no disclosure was required.

The above discussion compels denial of the motion to dismiss, because the allegations directed to the non-forward-looking statements state a claim on which relief could be granted. Therefore, it is not strictly necessary to tackle the other issue raised by defendants' motion, which relates to the use of cautionary language in EVCI's various filings. However, I will do so.

Cautionary language is language that identifies important factors "that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c). To be meaningful, cautionary language "must precisely address the substance of the specific statement or omission that is challenged." In re Nortel Networks Corp. Sec. Litigation, 238 F. Supp.613, 628 (S.D.N.Y. 2003); see also Semerenko v. Cendant Corp., 223 F. 3d 165, 182 (3d Cir. 2000); In re Donald J. Trump Casino Securities Litigation – Taj Mahal Litig., 7 F. 3d 357, 371-72 (2d Cir. 1993).

There is no question that some of the disclosures identified by plaintiffs qualify as forward looking. There is also no question that the forward-looking disclosures made by EVCI are accompanied by cautionary language. The question is whether, at this stage of the proceedings,  that cautionary language can fairly be described as meaningful.

Defendants claim that they identified the risk factors that could lead their forward-looking projections of increased enrollments and revenues to prove overly optimistic, including failure to comply with federal and state regulations; disapproval of new college cites (including extension center status for Washington Heights and Yonkers); and failure to manage aggressive enrollment growth. These were indeed the risk factors that eventually led to the dramatic decline in EVCI's stock price.

However, plaintiffs argue that the disclosure of these factors was not "meaningful" because EVCI did not disclose that the risk factors were not merely hypothetical (i.e., they "could" happen), but were in fact happening: that is, EVCI did not reveal that, at the time it was predicting increased revenue, Interboro was in fact out of regulatory compliance, was in fact failing to manage its aggressive enrollment growth, had been told by state regulators to cut back on growth; and (at a certain point in time) was not going to have new college sites approved.

13

I agree with plaintiffs that this allegation, if proven, would take the forward-looking disclosures out of the PSLRA's Safe Harbor – not because defendants did not identify the correct risk factors, but because the disclosures failed to warn investors that the risk factors were not hypothetical – which, of course, dramatically increased the possibility of adverse consequences. That is what makes the forward-looking disclosure misleading (if they are misleading – an issue that must abide discovery). As Judge Pollack presciently noted some years ago, in the context of the judicially-created "bespeaks caution" doctrine (analogous to and a predecessor of the PSLRA's Safe Harbor provision): "To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already happened is deceit." In re Prudential Securities Inc. Ltd. Partnerships Litigation, 930 F. Supp. 68, 72 (S.D.N.Y. 1996).[2]

Of course, if the evidence reveals that plaintiffs' allegations about the existence of unfavorable events are unfounded, the Safe Harbor provision may yet absolve defendants of liability for any forward-looking statement, identified as such, that was accompanied by meaningful cautionary language. Asher v. Baxter International, Inc., 377 F. 3d 727, 735 (7th Cir. 2004) (Easterbrook, J.). Unfortunately for defendants, this is one of those (probably) rare cases where the Safe Harbor issue is not amenable to final resolution on the pleading, even accompanied by all the relevant press releases and SEC filings. It depends on facts that remain to be developed in discovery.

**Control Person Liability**

Because the complaint adequately alleges both a primary violation of the act by EVCI and direct or indirect control of the primary violator by Buntzman, McGrath and Goldenberg, the amended complaint sufficiently alleges that the individual defendants are liable as control persons under Section 20(a) of the Exchange Act.

**Conclusion**

---

[2] In a footnote, defendants also argue that their projections are protected under the "bespeaks caution" doctrine. The argument is appropriately relegated to a footnote, since that doctrine only affords protection when the forward-looking statement, taken together with the accompanying cautionary language, do not alter the total mix of information available to investors. In re Donald J. Trump Casino Securities Litigation – Taj Mahal Litig., 7 F. 3d 357, 364, 368-73 (2d Cir. 1993).The allegations of this complaint posit a situation in which the defendants well knew that Interboro was out of regulatory compliance and that the illegally-opened Yonkers site had been disapproved as an extension center, but did not disclose those known facts – instead always couching the truth with "ifs," as though these things had not yet happened.

accompanied by all the relevant press releases and SEC filings. It depends on facts that remain to be developed in discovery.

**Control Person Liability**

Because the complaint adequately alleges both a primary violation of the act by EVCI and direct or indirect control of the primary violator by Buntzman, McGrath and Goldenberg, the amended complaint sufficiently alleges that the individual defendants are liable as control persons under Section 20(a) of the Exchange Act.

**Conclusion**

The motion to dismiss is denied. The parties are directed to comply with the attached scheduling order. All discovery disputes are to be resolved by the assigned Magistrate Judge Yanthis in accordance with the White Plains Magistrates' Standing Order on Discovery Disputes. Discovery must be completed by June 30, 2007. The court will not entertain any request for an extension of this deadline.

Dated: December 13, 2006

_____
U.S.D.J.

BY FAX TO ALL COUNSEL