USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————— x

IN RE EVCI CAREER COLLEGES          Master File No. 05 Civ. 10240 (CM)
HOLDING CORP. SECURITIES                        05CV 10287
LITIGATION                                      05CV10515
                                                05CV10610
————————————————————— x                         06CV 00304
                                                06CV 00347
                                                06CV 01684

**DECISION AND ORDER**
**APPROVING SETTLEMENT OF CLASS ACTIONS AND**
**AWARDING FEES AND DISBURSEMENTS TO LEAD COUNSEL**

McMahon, J.:

## I. PRELIMINARY STATEMENT

After more than fourteen months of litigation, Lead Counsel, with the active

participation, oversight and consent of ATRS, have reached a Settlement with Defendants to

resolve the Class's claims against them for a cash payment of $7,725,000. The Settlement

constitutes 35% of the $22 million of damages estimated by Lead Plaintiff's damages expert.

*See* Declaration of Jane D. Nettesheim ("Nettesheim Decl."), Exhibit 2 to the Stewart

Declaration ("Stewart Decl."). ¶ 12. It includes substantially all of the EVCI's available

insurance. And it ensures recovery for the class that might otherwise not be possible, given

EVCI's precarious financial condition: there was significant risk that, even if ATRS succeeded

at trial, the resulting damage award could be wiped out by a bankruptcy filing.

That risk of non-recovery in the face of success was in addition to the usual risks faced

by plaintiffs' counsel in litigation brought under the Private Securities Litigation Reform Act of

1995 (the "PSLRA"). Even assuming ATRS was successful in establishing Defendants' scienter,

the issues of causation and damages would have been hotly contested at trial. Defendants

intended to argue that the Class did not suffer any compensable damages, or that those damages

were a fraction of what ATRS estimated.

1

The Settlement was achieved only after Lead Counsel conducted extensive legal and factual investigations into the events and circumstances underlying the claims asserted in the Action; thoroughly researched the law pertinent to the claims against Defendants and potential defenses thereto; consulted with experts on the Class's damages; and interviewed numerous witnesses. Stewart Decl. ¶ 5. Thus, the Settlement was reached only after Lead Counsel and ATRS had attained – through Lead Counsel's aggressive prosecution efforts – a thorough understanding of the strengths and weaknesses of the claims against Defendants. Counsel were in an optimal position to negotiate and judge the terms of the proposed Settlement.

The Settlement is the product of adversarial arm's-length negotiations that took place over a several week period with the involvement of ATRS and consultation with its damages expert. Stewart Decl. ¶¶ 33-37. At the same time, Lead Counsel continued to pursue the Class's claims through the discovery process. *Id.* ¶ 32.

Lead Plaintiff actively participated both in the prosecution of this Action and the settlement negotiations. ATRS regularly consulted with Lead Counsel on all substantive matters, reviewed all pleadings, and consulted in and monitored the negotiation process. *See* Clark Decl. ¶¶ 3.9-11. The PSLRA was enacted in part to ensure that sophisticated institutional investors such as ATRS would participate in and control securities litigation. Legal Counsel of ATRS, who was involved in all aspects of the prosecution and settlement of this Action, has approved the Settlement as fair, adequate and reasonable, *see id.* ¶ 12. Lead Plaintiff believes that the Settlement is a superior result and strongly urges the Court to grant its approval.

Pursuant to the Preliminary Approval Order, the Notice was mailed to 9,548 potential Class members or their nominees. *See* Affidavit of Steven Mueller, attached to Stewart Decl. as Exhibit 2, ¶ 7. The Notice (attached as Exhibit A to the Mueller Affidavit) advised Class

members of the proposed Settlement, the proposed Plan of Allocation and the request for an award of attorneys' fees and reimbursement of expenses. The Notice further advised Class members of their right to object or seek exclusion from the Class. Additionally, the Summary Notice of Proposed Settlement, Settlement Fairness Hearing and Petition for Attorneys' Fees and Reimbursement of Litigation Expenses (the "Summary Notice") was published in the national edition of *The Wall Street Journal* and over the *PR Newswire* on May 21, 2007. *Id.* ¶ 10. Information regarding the Settlement, including downloadable copies of the Notice and Claim Form, was posted on www.evcisecuritiessettlement.com, the website dedicated to the Settlement, *id.* ¶ 8, and was available through the Claims Administrator's website, www.analytics-inc.com, and Lead Counsel's website, www.blbglaw.com, Stewart Decl. ¶ 42. Not a single Class member has filed an objection to the proposed Settlement, the Plan of Allocation, or the fee application, or sent in a valid exclusion request. *See* Stewart Decl. ¶ 43.

The proposed settlement meets all the factors set forth by the Second Circuit in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974). It is, therefore, approved.

## II. BACKGROUND

This Action was brought against EVCI and certain of its senior executives for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder. Stewart Decl. ¶ 30. The filing of this Action was precipitated by a disclosure by EVCI on October 19, 2005 that a compliance review conducted by the New York State Education Department (the "NYSED") recommended that one of EVCI's career colleges, Interboro Institute ("Interboro"), increase "the number and percent of full-time faculty, hav[e] contracts with full-time faculty, improv[e] Interboro's libraries, improv[e] other facilities and equipment resources and assess[] and improv[e] the quality of student learning,"

3

and by a further disclosure by the Company on December 6, 2005 that it had received the NYSED's final report of its compliance review of Interboro, which set forth a litany of deficiencies at Interboro's instructional locations and detailed fraudulent practices in admissions and financial aid. *Id.* ¶¶ 8-18, 21. In response to those disclosures, the market price of EVCI common stock dropped from $5.53 on October 18, 2005 to $1.80 on December 6, 2005. *Id.* ¶ 21.

By Order dated May 9, 2006, this Court consolidated the six class actions that had been filed, and appointed ATRS as Lead Plaintiff and approved ATRS's selection of BLB&G as Lead Counsel. Stewart Decl. ¶ 25. Thereafter, Lead Counsel launched an extensive investigation that included interviews with numerous witnesses, review of thousands of pages of documents obtained through FOIL requests, and a review of EVCI's public statements and SEC filings. *Id.* at ¶¶ 27-29. That investigation resulted in the filing on July 21, 2006 of Lead Plaintiff's Consolidated Amended Class Action Complaint (the "Complaint"). *Id.* at ¶ 30.

Defendants moved to dismiss the Complaint. Relying on their own public filings and the results of an investigation commissioned by EVCI's Audit Committee after the NYSED had uncovered fraudulent admissions and financial aid practices at Interboro, Defendants argued, among other things, that (i) ATRS did not adequately plead that there was a fraud at EVCI, (ii) the market was aware of the regulatory risk at EVCI such that there were no actionable false statements or omissions; (iii) Defendants did not act with the requisite scienter required to plead liability for securities fraud; and (iv) EVCI's "forward-looking" statements were shielded by the Safe Harbor provisions of the PSLRA. *Id.* ¶ 31.

By Order dated December 13, 2006, the Court denied Defendants' motion in its entirety, stating, "If ever a complaint was well-pleaded under the PSLRA, this one is." *See* Decision and Order Denying Motion to Dismiss Consolidated Amended Class Action Complaint (the

4

"December 13, 2006 Order") at 1. The Court, citing to Lead Counsel's comprehensive
investigation (which "involved interviewing persons who are or were formerly associated with
Interboro" and which concluded that the results of that investigation "contradict in substantial
part the Audit Committee's conclusions that the fraudulent admissions practices were confined
to a few rogue employees and were unknown to management,") *id.* at 6, complimented the
Complaint as "one of the best supported securities fraud complaints this court has seen."
December 13, 2006 Order at 9.

After the motion to dismiss was denied, Lead Counsel immediately served discovery
requests and embarked on discovery. Settlement negotiations ensued shortly thereafter.

## III. THE PROPOSED SETTLEMENT

### *A. The Proposed Settlement Is Fair, Reasonable And Adequate And Should Be Approved*

1. Standards for Approval of a Class Action Settlement

"Settlement approval is within the Court's discretion, which 'should be exercised in light
of the general judicial policy favoring settlement.'" *In re Sumitomo Copper Litig.*, 189 F.R.D.
274, 280 (S.D.N.Y. 1999) (citation omitted; *accord Maley v. Del Global Techs. Corp.*, 186 F.
Supp. 2d 358, 361 (S.D.N.Y. 2002) (McMahon, J); *In re American Bank Note Holographics, Inc.
Sec. Litig.*, 127 F. Supp. 2d 418, 423 (S.D.N.Y. 2001) (McMahon, J.). In evaluating a proposed
settlement under Rule 23(e) of the Federal Rules of Civil Procedure, the Court must determine
whether the settlement, taken as a whole, is fair, reasonable and adequate. *Maywalt v. Parker &
Parsley Petroleum Co.*, 67 F.3d 1072, 1079 (2d Cir. 1995); *see also In re WorldCom Sec. Litig.*,
No. 02 Civ. 3288 (DLC), 2004 WL 2591402 (S.D.N.Y. Nov. 12, 2004). As noted by courts
generally, "[t]he arm's-length compromise of a disputed claim has long been favored by the
courts." *E.g., Sumitomo*, 189 F.R.D. at 280 (and cases cited therein); *see also Carson v.*

5

*American Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981). This is particularly true of class actions.

*Sumitomo*, 189 F.R.D. at 280; *In re Union Carbide Corp. Consumer Prod. Bus. Sec. Litig.*, 718

F. Supp. 1099, 1103 (S.D.N.Y. 1989). As the court in *WorldCom* summarized:

> In brief, the district court must carefully scrutinize the settlement to ensure its
> fairness, adequacy and reasonableness, and that it was not the product of
> collusion. A district court determines a settlement's fairness by examining the
> negotiating process leading up to the settlement as well as the settlement's
> substantive terms.

2004 WL 2591402 at *10 (quotations and citations omitted); *see also Wal-Mart Stores, Inc. v.*

*Visa U.S.A. Inc.*, 396 F.3d 96, 116-17 (3d Cir. 2005), *cert. denied sub nom*, *Leonardo's Pizza by*

*the Slice, Inc. v. Wal-Mart Stores, Inc.*, 544 U.S. 1044 (2005).

A proposed class action settlement enjoys a strong presumption that it is fair, reasonable

and adequate if, as is the case here, it was the product of arm's-length negotiations conducted by

capable counsel, well-experienced in class action litigation arising under the federal securities

laws. *See, e.g., Sumitomo*, 189 F.R.D. at 280; *New York & Maryland v. Nintendo of Am., Inc.*,

775 F. Supp. 676, 680-81 (S.D.N.Y. 1991). Moreover, under the PSLRA, a settlement reached

under the supervision of appropriately selected lead plaintiffs is entitled to an even greater

presumption of reasonableness. As stated in the Senate Committee Report issued in support of

the PSLRA, cited in *Greebel v. FTP Software, Inc.*, 939 F. Supp. 57, 63-64 (D. Mass. 1996):

"Institutions with large stakes in class action share much the same interests as the plaintiff class

generally; thus, courts could be more confident settlements negotiated under the supervision of

institutional plaintiffs were 'fair and reasonable.'" Absent fraud or collusion, the court should be

hesitant to substitute its judgment for that of the parties who negotiated the settlement.

The standards governing approval of class action settlements are well-established in this

Circuit. In *City of Detroit v. Grinnell Corp.*, the Court of Appeals held that the following were

factors to be considered in evaluating a class action settlement:

(1) the complexity, expense and likely duration of the litigation . . .; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d 448, 463 (2d Cir. 1974) (citations omitted); *see also County of Suffolk v. Long Island*

*Lighting Co.*, 907 F.2d 1295, 1323-24 (2d Cir. 1990); *Sumitomo*, 189 F.R.D. at 281; *WorldCom*,

2004 WL 2591402, at *10. In applying these factors, a court neither substitutes its judgment for

that of the parties who negotiated the settlement nor conducts a mini-trial of the merits of the

action. *Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982); *In re Michael Milken & Assocs.*

*Sec. Litig.*, 150 F.R.D. 46, 53 (S.D.N.Y. 1993). As the Second Circuit stated in *Newman v.*

*Stein*:

[T]he role of a court in passing upon the propriety of the settlement of a . . . class action is a delicate one . . . . [W]e [recognize] that since the very purpose of a compromise is to avoid the trial of sharply disputed issues and to dispense with wasteful litigation.' the court must not turn the settlement hearing 'into a trial or a rehearsal for the trial.

464 F.2d 689, 691-92 (2d Cir. 1972) (internal citations and quotation marks omitted); *accord*

*Maley*, 186 F. Supp. 2d at 360-61.

The Court is now asked to determine whether the Settlement is within a range that

reasonable and experienced attorneys, and a sophisticated institutional Lead Plaintiff, could

accept, considering all relevant risks, facts and circumstances. *See Weinberger*, 698 F.2d at 74;

*Grinnell*, 495 F.2d at 455. The range, as defined by Judge Friendly, "recognizes the

uncertainties of law and fact in any particular case and the concomitant risks and costs

necessarily inherent in taking any litigation to completion." *Newman*, 464 F.2d at 693.

7

## 2. Application of the *Grinnell* Factors Supports Approval of the Settlement

### a) *The Complexity, Expense and Likely Duration of the Litigation*

The "complexity, expense and likely duration of the litigation" are factors that the Court should consider in evaluating a proposed settlement for approval. *Grinnell*, 495 F.2d at 463; *In re Drexel Burnham Lambert Group Inc.*, 130 B.R. 910, 927 (S.D.N.Y. 1991). "In evaluating the settlement of a *securities* class action, federal courts, including this Court, have long recognized that such litigation is notably difficult and notoriously uncertain." *Sumitomo*, 189 F.R.D. at 281 (citations omitted; emphasis added). That statement is certainly true here.

As reflected in the Stewart Declaration, this prosecution involved complex legal and factual issues, and, but for the Settlement, would have involved substantial document discovery. Stewart Decl. at ¶ 61. Indeed, Lead Counsel had already undertaken a comprehensive investigation prior to reaching agreement on the terms of the Settlement, and would have had tens of thousands of additional documents to review if no settlement had been reached. *Id.* at ¶¶ 27-29. And notwithstanding Lead Counsel's interviews of many witnesses in connection with its investigation, continued prosecution and trial of this case would have required Lead Counsel to take the depositions of dozens of witnesses. In addition, all parties would have relied on a number of experts to produce reports and testify on complex issues including regulatory and damages calculations; the successful prosecution of this Action would have depended upon extensive discovery of those experts.

Absent the Settlement, there would have been significant additional resources and costs expended to prosecute the claims through trial and the inevitable appeals. *See In re Prudential Ins. Co. Am. Sales Practice Litig.*, 148 F.3d 283, 318 (3d Cir. 1998) (settlement favored where "trial of this class action would be a long, arduous process requiring great expenditures of time

8

and money on behalf of both the parties and the court"). Given the complex issues at the heart of ATRS's allegations, this was a challenging case to present to a jury and, even if Defendants' liability had been established, there were significant issues relating to the damages that a jury might have awarded, and the Defendants' ability to pay a judgment. In contrast, the Settlement provides a definite and substantial recompense to the Class now, rather than await the uncertain outcome prompted by the effort and time devoted to trial and likely appeals. As this Court held in *Maley*:

> Settlement at this juncture results in a substantial and tangible present recovery, without the attendant risk and delay of trial. These factors weigh in favor of the proposed Settlement. As the court in *Slomovics v. All for a Dollar, Inc.*, 906 F. Supp. 146, 149 (E.D.N.Y. 1995), concluded: "The potential for this litigation to result in great expense and to continue for a long time suggest that settlement is in the best interests of the Class." *Id.* (citation omitted). The same reasoning applies here. Delay, not just at the trial stage but through post-trial motions and the appellate process, would cause Class Members to wait years for any recovery, further reducing its value.

186 F. Supp. 2d at 361-62 (citing, *inter alia, American Bank Note,* 127 F. Supp. 2d at 424-25).

b) *The Response of the Class*

As the cases report, a positive reaction of the Class to the proposed Settlement is a further factor favoring its approval by the Court. *See Grinnell,* 495 F.2d at 462 (approving settlement where only twenty objectors appeared from group of 14,156 claimants); *Maley,* 186 F. Supp. 2d at 362-63 ("It is well-settled that the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy."); *American Bank Note*, 127 F. Supp. 2d at 425). No Class Members have objected to the Settlement, and none have opted out. Stewart Decl. ¶ 43.[1] The reaction of the Class to date supports approval of the Settlement.

---

[1]  Rule 23(c)(2) requires "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173-75 (1974). The Court-approved Notice was sent to all identifiable potential Class Members, and the Summary Notice appeared in the national edition of *The Wall Street Journal* and over *PR Newswire*. *See* Mueller Aff. ¶¶ 3-8, 10. The Notice

c) *The Stage of the Proceedings and Amount of Discovery Completed*

"[T]he stage of the proceedings and the amount of discovery completed" are other
*Grinnell* factors to be considered in determining the fairness, reasonableness and adequacy of a
settlement. *Grinnell*, 495 F.2d at 463. These criteria are met here. While the Settlement was
reached at a relatively early stage in this litigation, when formal discovery had just commenced,
"Formal discovery is not a prerequisite; the question is whether the parties had adequate
information about their claims." *In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436,
458 (S.D.N.Y. 2004) ("Plaintiffs' counsel appear to have scrutinized the facts of the Actions
from the earliest stages of the litigation and developed an informed basis from which to negotiate
a reasonable compromise."); *Maley*, 186 F. Supp. 2d at 363-64 ("To approve a settlement,
however, "the Court need not find that the parties have engaged in extensive discovery.") (citing,
*inter alia, American Bank Note*, 127 F. Supp. 2d at 425-26). Well before the Settlement was
reached here, Lead Counsel had extensively analyzed and investigated the events and
transactions alleged in the Complaints, having reviewed and analyzed Defendants' public
statements and SEC filings, interviewed numerous fact witnesses, reviewed thousands of pages
of documents obtained from NYSED through FOIL requests, and retained and consulted with a
damages expert. *See* Stewart Decl. ¶¶ 27-29. In short, ATRS and Lead Counsel engaged in
sufficient investigation and discussions about the merits of the Action to evaluate fully the merits
of the claims and the obstacles to success. *See Maley*, 186 F. Supp. 2d at 364 (Even though
discovery had not begun by the time settlement was reached, "Plaintiffs' Counsel possessed a
record sufficient to permit evaluation of the merits of Plaintiffs' claims, the strengths of the
defenses asserted by Defendants, and the value of Plaintiffs' causes of action for purposes of

---

contained all information required by § 21D(vi)(7) of the PSLRA, and is more than adequate to
meet the requirements of due process and Rule 23(c)(2) and (e).

settlement."); *In re Medical X-Ray Film Antitrust Litig.*, No. CV-93-5904, 1998 WL 661515, at *4 (E.D.N.Y. Aug. 7, 1998). Thus, in this case, it may be said that the parties "have a clear view of the strengths and weaknesses of their cases." *In re Warner Comm. Sec. Litig.*, 618 F. Supp. 735, 745 (S.D.N.Y. 1985) *aff'd*, 798 F.2d 35 (2d Cir. 1986).

> d) *Risks Involved in Establishing Liability and Damages, and in Maintaining the Class Action Through Trial*

*Grinnell* holds that, in assessing the fairness, reasonableness and adequacy of a settlement, courts should consider such factors as the "risks of establishing liability," "the risks of establishing damages," and "the risks of maintaining the class action through the trial." 495 F.2d at 463 (citations omitted). These factors also support approval of the Settlement.

There are certain unassailable facts and risks that had to be considered by ATRS in assessing the sufficiency of the Settlement. As in any securities class action under the PSLRA, ATRS faced a high burden in demonstrating that Defendants acted with scienter. While Lead Plaintiff believed that it could meet that standard, Defendants, in their motion to dismiss, vigorously argued that ATRS's allegations were insufficient. Stewart Decl. ¶ 31. At trial, Lead Plaintiff expected Defendants to argue that the Class could not establish scienter because the individual officers had no knowledge of, and did not participate in, the alleged fraud. *Id.* ¶ 61. If the allegations of the Complaint were proven, ATRS should have been able to meet its burden, but it could not dismiss the possibility that a reasonable jury would conclude otherwise.

In addition, while Defendants have stipulated to the certification of the Class for purposes of the Settlement, there would have been no such stipulation had ATRS prosecuted the Action to trial. Defendants would have vigorously challenged Lead Plaintiff's motion for class certification based on, among other grounds, that the Class Period, which begins on August 14, 2003 as pleaded, should not have started before the August 26, 2004 disclosure by EVCI of the

New York State Comptroller's issuance of an audit report that concluded that Interboro had wrongfully obtained nearly $1 million in TAP funds during the 2000-01 and 2002-03 school years. Any reduction in the size of the Class would have affected the claims and damages at issue in the Action. Defendants also could have challenged the inclusion in the Class of investors who sold EVCI common stock after partial disclosures before the end of the Class Period. *See, generally, e.g., In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, No. MDL 1500, 02 Civ. 5575(SWK), 2006 WL 903236, at \*12 (S.D.N.Y. Apr. 6, 2006) (risk of succeeding in certifying class supported approval of settlement); *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. at 460 (same). Indeed, the success of any of these arguments would have splintered the Class.

> [N]ot only does the aggregation of the claims enlarge the value of the suit, but often the combination of the individual cases also pools litigation resources and may facilitate proof on the merits. Thus, the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the action.

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.*, 55 F.3d 768, 817 (3d Cir. 1995); *see also In re Lucent Techs., Inc., Sec. Litig.*, 307 F. Supp. 2d 633, 646 (D.N.J. 2004) ("Class certification influences the value of a class action.").

Even if the Class were certified, Defendants' scienter proven and liability established, ATRS faced the burden of proving both the extent of the Class's damages and that those damages were caused by Defendants' conduct. Specifically, Lead Plaintiff would need to establish that the alleged misrepresentations and omissions resulted in actual damages, and quantify the damages suffered by the Class. ATRS would have to establish that the price that each Class member paid for shares of EVCI stock was artificially inflated on the date of purchase and, pursuant to *Dura Pharma. Inc. v. Broudo*, 544 U.S. 336, 344-45 (2005), that such inflation was confirmed by post-purchase stock movements tied to disclosures related to the fraud. To do so, Lead Plaintiff retained a damages expert, who would opine on what the "true

value" of EVCI shares would have been during the Class Period had there been no fraud and

who, at trial, would have explained how stock movements in response to subsequent disclosures

confirmed, per *Dura*, the extent of the fraud-induced price inflation. ATRS's expert concluded

that the Class's damages were approximately $22 million. *See* Nettesheim Decl., ¶ 12.  While

the theories behind and validity of Lead Plaintiff's expert's conclusions are supported by

economic and legal theory and could withstand scrutiny, Defendants would have presented their

own damages experts, with conflicting conclusions and theories. *See* Nettesheim Decl. ¶¶ 13-14

(setting forth the types of challenges anticipated, and estimating damages under a typical

"defendant style" analysis at between $11 and $15 million). Ultimately, proving damages would

come down to "a battle of the experts," and it is impossible to predict which expert and theory of

damages the jury would accept. *See American Bank Note*, 127 F. Supp. 2d at 426-27 ("In such a

battle, Plaintiffs' Counsel recognize the possibility that a jury could be swayed by experts for

Defendants, who could minimize or eliminate the amount of Plaintiffs' losses"); *In re

PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 129 (S.D.N.Y. 1997) ("damages are a matter

for the jury, whose determinations can never be predicted with certainty"), *aff'd*, 117 F.3d 721

(2d Cir. 1997).

          e) *Collectibility and Defendants' Ability to Withstand a Greater Judgment*

EVCI's uncertain financial condition and the consequent threat of non-collectibility

posed the most significant risk to Lead Plaintiff's continued prosecution of this Action. Stewart

Decl. ¶¶ 34-37. This risk existed from the outset, and events since Settlement was submitted to

the Court confirm that the risk was substantial.  In a Form 8-K EVCI filed on June 19, 2007,[3] the

Company disclosed that it had received a notice from the NASDAQ that EVCI's stock was

subject to delisting, and that the Company had unsuccessfully sought a "financial viability"

---

[3]  http://www.sec.gov/Archives/edgar/data/1065591/000114420407032623/v078819.htm.

exception to NASDAQ's shareholder vote requirement for the private placement of securities with ComVest Investment Partners III L.P. (the "ComVest Financing"). Although NASDAQ rules required shareholder approval for the ComVest Financing prior to its closing, "in order to ensure EVCI's financial viability, EVCI management and the board of directors determined that it was necessary to complete the ComVest Financing prior to the receipt of stockholder approval." Given the extent of the damages calculated by Lead Plaintiff's expert, any judgment for a substantial portion of the Class's damages would likely have resulted in the Company's bankruptcy. The risk that a successful prosecution will result in the bankruptcy of the defendant strongly weighs in favor of approval of a settlement. *See Grinnell*, 356 F. Supp. at 1389 (the "prospect of a bankrupt judgment debtor down at the end of the road does not satisfy anyone involved in the use of class action procedures"); *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 746 (S.D.N.Y. 1985) (where defendant cited to risk of bankruptcy, "certainty of payment of the settlement is advantageous to the class"); *see also In re Global Crossing*, 225 F.R.D. 436, at 460 (S.D.N.Y. 2004) ("without the proposed settlement, class members might well receive far less than the settlement would provide to them, even if they could prevail on their claims"); *Maley*, 186 F. Supp. 2d at 365 (In view of defendant's "dire financial condition," and noting wasting nature of insurance, "obtaining a greater recovery than provided by the Settlement would have been difficult." (citing *American Bank Note*, 127 F. Supp. 2d at 427).

As noted above, Lead Plaintiff understood from the outset that EVCI's inability to fund a significant cash settlement posed the greatest hurdle to the resolution of the Action. Stewart Decl. ¶ 2. The Company's public filings reflected significant and growing operating losses and delisting of the Company's stock had been threatened as early as June 13, 2006. *Id.* at ¶ 35. ATRS and Lead Counsel therefore devoted efforts to understanding EVCI's present and

projected financial condition, as well as the amount of available insurance, and to working to maximize the recovery that could be obtained for the Class. *Id.* ¶¶ 35-36. On the basis of publicly available information and Lead Counsel's analysis, ATRS and Lead Counsel evaluated EVCI's settlement offers in order to ensure that the Settlement offered the maximum value for the Class. *Id.* Lead Plaintiff and Lead Counsel believe, based on their understanding of EVCI's financial wherewithal, that the Company could not satisfy a judgment substantially in excess of the recovery obtained through the Settlement. Clark Decl. ¶ 12; Stewart Decl. ¶ 37.

f) *The Range of Reasonableness of the Settlement Amount in Light of the Best Possible Recovery and in Light of All Risks of Litigation*

In order to calculate the "best possible" recovery, the Court must assume complete victory on both liability and damages as as to all class members on every claim asserted against each defendant in the Action. Courts agree that the determination of a "reasonable" settlement "is not susceptible of a single mathematical equation yielding a particularized sum." *In re PaineWebber*, 171 F.R.D. at 130 (citation omitted); *In re Union Carbide*, 718 F. Supp. at 1103. Rather, "in any case there is a range of reasonableness with respect to a settlement." *Newman v. Stein* 464 F.2d at 693; *Zerkle v. Cleveland-Cliffs Iron Co.*, 52 F.R.D. 151, 159 (S.D.N.Y. 1971). As the Second Circuit has stated "[t]he fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *Grinnell*, 495 F.2d at 455. The Second Circuit further explained that, "[i]n fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *Id.* at 455 n.2.

Despite the obstacles facing ATRS on the issues of liability and damages, ATRS believes that it would be able to prove its claims and obtain a verdict for substantial damages. However,

15

that verdict would likely be a pyrrhic victory. ATRS and Lead Counsel concluded that EVCI simply could not satisfy such a judgment, and that continued litigation likely would have wasted the limited available insurance. Lead Plaintiff was only able to secure a recovery from the insurance policies through negotiation and settlement. When the benefits of the guaranteed recoveries from Defendants are weighed against the risks of continued litigation, approval of the Settlement is warranted. *See In re "Agent Orange" Prod. Liab. Litig.*, 611 F. Supp. 1396, 1405 (E.D.N.Y. 1985) ("much of the value of a settlement lies in the ability to make funds available promptly"), *modified on other grounds*, 818 F.2d 179 (2d Cir. 1987).

Given the obstacles and uncertainties attendant to this complex litigation, ATRS submits that the Settlement is well within the range of reasonableness, and better for the Class than the other possibilities, which could have been little or no recovery at all. Indeed, the Settlement yields a significant recovery for the Class, particularly as a percentage of the amounts that ATRS estimated to be the damages in the case. Specifically, Lead Plaintiff's expert estimated that, assuming the jury agreed with all of her data and assumptions, the maximum aggregate damages were approximately \$22 million. *See* Nettesheim Decl. ¶ 12. Thus, the recovery from the proposed Settlement represents 35% of the maximum damages that ATRS could have recovered had the jury accepted its expert's view of damages. Lead Plaintiff's expert also concluded that Defendants' experts would tell the jury that the Class did not suffer any compensable damages at all or, even if the Class did, those damages amounted to between \$11 and \$15 million. *Id.* at ¶¶ 13-14. The proposed Settlement thus represents a recovery of between 51.5 and 70.2% of the damages that Defendants would likely have argued were incurred by the Class.

Accordingly, each of the *Grinnell* factors discussed above supports approval of the Settlement by this Court.

3. The Proposed Settlement Is the Product of Informed Arm's-Length Negotiations and Is Presumptively Fair

"In appraising the fairness of a proposed settlement, the view of experienced counsel favoring the settlement is 'entitled to great weight'. . . There is thus a strong initial presumption that the compromise as negotiated herein under the [c]ourt's supervision is fair and reasonable." *In re Michael Milken*, 150 F.R.D. at 54; *see also In re Union Carbide*, 718 F. Supp. at 1103. As the court noted in approving the settlement in *In re Sumitomo Copper Litig.*:

> So long as the integrity of the arm's-length negotiation process is preserved . . . *a strong initial presumption of fairness attaches to the proposed settlement.' In re PaineWebber*, 171 F.R.D. at 125. As likewise stated by the *Manual for Complex Litigation*, a '*presumption of fairness, adequacy and reasonableness* may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.' *Manual for Complex Litigation, Third* ¶ 30.42 (1995).

189 F.R.D. at 280-81 (emphasis in original). As in *Sumitomo*, the parties to the Settlement negotiated it at arm's-length. Thus, the presumption of fairness "clearly attaches here." As discussed above and as set forth in the Stewart Declaration, the Settlement was negotiated at arm's-length over several weeks among Lead Counsel, in consultation with ATRS, and counsel for Defendants. *See generally* Stewart Decl. ¶ 33. Accordingly, ATRS and Lead Counsel recommend that the Court approve the Settlement.

## B. *The Plan Of Allocation Is Fair And Reasonable*

"To warrant approval, the plan of allocation must also meet the standards by which the settlement was scrutinized – namely, it must be fair and adequate." *WorldCom*, 388 F. Supp. 2d at 344 (quoting *Maley*, 186 F. Supp. 2d at 367). As numerous courts have held, a plan of allocation need not be perfect. *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, No. 94 Civ. 5587 (PKL RLE), 2000 WL 420548, at *2 (S.D.N.Y. Apr. 18, 2000) ("aggregate damages in securities fraud cases are generally incapable of mathematical precision") (citing *In re Oracle*

17

*Sec. Litig.*, 829 F. Supp. 1176, 1182 (N.D. Cal. 1993)); *see also In re Computron Software, Inc. Sec. Litig.*, 6 F. Supp. 2d at 320; *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1284-85 (9th Cir. 1992). Indeed, "[a]n allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel." *WorldCom*, 388 F. Supp. 2d at 344 (quoting *Maley*, 186 F. Supp. 2d at 367); *accord In re NASDAQ*, 2000 WL 37992 at *2.

In determining whether a plan of allocation is fair, courts look primarily to the opinion of counsel. *See Paine Webber*, 171 F.R.D. at 133 ("[T]he adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information."); *see also In re Lloyd's American Trust Fund Litig.*, No. 96 cv 1262 (RWS), 2002 WL 31663577, *18 (S.D.N.Y. Nov. 26, 2002); *White v. NFL*, 822 F. Supp. 1389, 1420 (D. Minn. 1993) (stating that "[t]he court . . . affords considerable weight to the opinion of experienced and competent counsel that is based on their informed understanding of the legal and factual issues involved" in approving distribution of settlement proceeds). Here, the Plan of Allocation fully complies with these standards.

Working with their damages expert, Lead Counsel has developed a Plan of Allocation that reflects in a simple and straightforward manner their damages theory of the case based upon their extensive investigation. *See* Nettesheim Decl. ¶¶ 4-12, 15. The Plan of Allocation accounts for the degree of inflation of EVCI common stock caused by Defendants' alleged misconduct during the Class Period, and accounts for the extent to which that inflation was relieved by the corrective disclosures of the Company's true condition made prior to and at the end of the Class Period. As a result, the Plan of Allocation establishes a basis for calculating the

"Recognized Claim" of each Class Member whose overall transactions in EVCI common stock during the Class Period resulted in a loss.

Courts also consider the reaction of a class to a plan of allocation. *See Maley*, 186 F. Supp. 2d at 367; *Paine Webber*, 171 F.R.D. at 126. The Notice described the proposed Plan of Allocation in detail, and indicated that the deadline for objecting to the Plan of Allocation was July 13, 2007. No objections to the Plan of Allocation have yet been received. Accordingly, the Plan of Allocation should be approved as fair, reasonable and adequate.

## C. *Certification of the Class for Settlement Purposes Is Proper and Necessary*

For settlement purposes only, ATRS requests that the Court certify the Class, which, with the exceptions set forth in ¶1.4 of the Stipulation, consists of all persons who purchased or otherwise acquired EVCI common stock from August 14, 2003 through December 6, 2005. In the settlement context, class certification criteria are easily met because the class is unified by a common interest in a reasonable recovery. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997). Although class action requirements must be met when certifying a settlement class, the settlement must be taken into account. *Id.* Indeed, the Second Circuit has long acknowledged the propriety of certifying a class solely for purposes of a class action settlement. *See Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982); *see also In re Baldwin United Corp.*, 105 F.R.D. 475, 478 (S.D.N.Y. 1984).

Classes certified for settlement purposes, like all other classes, must meet each of the requirements set forth in Rule 23(a) and at least one of three requirements set forth in Rule 23(b). *In re Prudential Sec. Inc. P'ships Litig.*, 163 F.R.D. 200, 205 (S.D.N.Y. 1995). In analyzing the class certification requirements, the Second Circuit "has directed district courts to apply Rule 23 according to a liberal rather than a restrictive interpretation and has explicitly

noted its preference for class certification in securities cases." *In re Nortel Networks Corp. Sec. Litig.*, No. 01 Civ. 1855 (RMB), 2003 WL 22077464, at \*2 (S.D.N.Y. Sept. 8, 2003) (citations omitted). In determining whether to certify a class, courts must refrain from examining the underlying merits of the case unless they are relevant to the class certification requirements. *See, e.g., In re Livent, Inc. Noteholders Sec. Litig.*, 211 F.R.D. 219, 221 (S.D.N.Y. 2002) ("In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met") (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974)). As relevant here, while the "some showing" standard is no longer appropriate, a district court must continue to refrain from making "a merits inquiry *unrelated* to a specific Rule 23 requirement" in evaluating whether to certify a class. *In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24, 35 (2d Cir. 2006) (emphasis in original); *see also Hnot v. Willis Group Holdings Ltd.*, No. 01 Civ. 6558 (GEL), 2007 WL 749675, at \*4 (S.D.N.Y. Mar. 8, 2007) (Lynch, J.) ("[the court] was *not* required 'to make a preliminary inquiry into the merits of a case in order to determine whether it may be maintained as a class action[.]'") (emphasis in original). Under these standards, the proposed Settlement Class meets the requirements of Rule 23 and should be certified for purposes of the Settlement.

Rule 23(a)(1) requires that the class be so numerous that joinder of all members is impracticable. In this Circuit, "Numerosity is presumed when a class consists of forty or more members." *In re Worldcom, Inc. Sec. Litig.*, 219 F.R.D. 267, 279 (S.D.N.Y. 2003). And "[i]n securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *Teachers Ret. Sys. of Louisiana v. ACLN*

*Ltd.*, No. 01-CV-11814 (LAP), 2004 WL 2997957, at *3 (S.D.N.Y. Dec. 27, 2004) (internal quotation marks omitted). Here, EVCI's shares traded on NASDAQ, and, as of December 6, 2005, 12,596,000 such shares were outstanding. EVCI had hundreds of thousands of shares traded during the Class Period, and, accordingly, the Class contains many thousands of persons.

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." In securities fraud litigation, the commonality requirement is applied permissively. *See ACLN*, 2004 WL 2997957, at *4; *In re Vivendi Sec. Litig*, No. 02 Civ 5571 (RJH), 2007 WL 861147, at *6 (S.D.N.Y. March 22, 2007) (quoting *Nortel*, 2003 WL 22077464, at *3). Not every question of law or fact must be common to every class member. *See, e.g., ACLN*, 2004 WL 2997957, at *4. Where plaintiffs allege that class members have been injured by the same fraudulent scheme, the commonality requirement is satisfied. *See, e.g., Berwecky v. Bear, Stearns & Co.*, 197 F.R.D. 65, 68 (S.D.N.Y. 2000) (commonality requirement met where plaintiffs alleged that "the defendants . . . entered into a scheme to defraud investors of the securities of the promoted companies by engaging in 'parking' of securities, unauthorized purchases, and other fraudulent practices"). As set forth in paragraph 27 of the Complaint, this case presents several common issues of law and fact. "Where, as here, Lead Plaintiff has alleged a common course of fraudulent conduct, which has allegedly caused all members of the Class to suffer damages, commonality is satisfied." *ACLN*, 2004 WL 2997957, at *4; *accord In re Oxford Health Plans*, 191 F.R.D. 369, 374 (S.D.N.Y. 2000).

Rule 23(a)(3) requires that plaintiffs' claims be typical of the class' claims. Courts have emphasized that the typicality requirement is not demanding, and that "[t]ypicality 'does not require that the factual background of each named plaintiff's claim be identical to that of all class members.'" *ACLN*, 2004 WL 2997957, at *4 (quotation omitted). Here, the claims

asserted by the ATRS are typical, if not identical, to the claims of the other Class members. ATRS alleges that Defendants violated the Exchange Act by issuing public statements and documents that misrepresented or omitted material facts. ATRS also alleges that it and the Class paid artificially inflated prices for EVCI stock as a result of Defendants' material misrepresentations and omissions. Those claims are thus based upon precisely the same theories and will be proven by precisely the same evidence. Accordingly, ATRS satisfies typicality under Rule 23(a)(3).

Rule 23(a)(4) requires that plaintiffs fairly and adequately protect the interests of the class. This requirement is comprised of two factors: (1) that the class representatives' attorneys are qualified, experienced and generally able to conduct the litigation; and (2) that the suit is not collusive, and plaintiffs' interests are not antagonistic to those of the other members of the class. *See, e.g., ACLN,* 2004 WL 2997957, at *4. BLB&G was previously approved as Lead Counsel by the Court. Lead Counsel is qualified and able to conduct the litigation, based on its extensive experience in securities class action litigation and successful prosecution of many of the most significant class actions under the PSLRA. In addition, there is no antagonism between ATRS and the Class. Lead Plaintiff and all Class Members have suffered losses as a result of their transactions in EVCI common stock during the Class Period.

A class action also must satisfy one of the subdivisions of Rule 23(b). The Class satisfies the requirements of Rule 23(b)(3), which provides that a class action may be maintained "if the prerequisites of subdivision (a) are satisfied, and in addition . . . the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Where, as here, ATRS alleges that

Defendants engaged in misrepresentations causing inflation in the price of stock, which is alleged to violate the federal securities laws, the issues of law and fact that flow from these activities predominate over any individual issue in a class action. *See Amchem*, 521 U.S. at 625 ("[p]redominance is a test readily met . . . [in] cases alleging . . . securities fraud"); *Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 127 (S.D.N.Y. 2001) (same).

A class action also is superior to other methods of adjudication, and is particularly appropriate for addressing claims of violations of the securities laws. Most violations of the federal securities laws, such as those alleged here, inflict economic injury on large numbers of geographically dispersed persons to such an extent that the cost of pursuing individual litigation to seek recovery against well-financed, multiple adversaries is not feasible. *See ACLN*, 2004 WL 2997957, at *9 ("'[S]ecurities suits such as this easily satisfy the superiority requirement of Rule 23 . . . Multiple lawsuits would be costly and inefficient, and the exclusion of class members who cannot afford separate representation would neither be 'fair' nor an adjudication of their claims.'") (quoting *Blech Sec. Litig.*, 187 F.R.D. at 107)).

The four factors specified in Rule 23(b)(3) favor class certification. *First*, there is no indication that members of the Class would prefer to individually control the prosecution of their claims; any who do have the opportunity to opt out or be represented by counsel of their own choice. *Second*, the court is unaware of any other class action litigation concerning the false statements and omissions alleged here against Defendants. *Third*, it is clearly desirable to concentrate the litigation in one forum in order to avoid inconsistent adjudications and thus promote fairness and efficient use of the judicial system. *Fourth*, this case presents no unusual difficulties in management of the Class action or notice to the Class. Lead Counsel and the

courts have handled numerous similar actions; in fact, settlement sets up a very efficient and workable means of administering claims to resolve this action.

For all the foregoing reasons, the Settlement is approved.

## IV. COUNSEL FEES AND DISBURSEMENTS

### A. The Requested Fee is Fair and Reasonable

#### 1. The Percentage-Based Fee Application Comports with the Legal Standards Governing Awards of Attorneys' Fees in this Circuit

It is well-settled that attorneys who represent a class and achieve a benefit for class members are entitled to be compensated for their services. The Supreme Court has recognized that "a lawyer who recovers a common fund for the benefit of persons other than . . . his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Savoie v. Merchants Bank*, 84 F.3d 52, 56 (2d Cir. 1996). The Supreme Court has further emphasized that private securities actions, such as the instant action, provide "'a most effective weapon in the enforcement' of the securities laws and are 'a necessary supplement to [SEC] action.'" *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (quoting *J. I. Case Co. v. Borak*, 377 U.S. 426, 432 (1964)); *accord Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, No. 06-484, ___ S. Ct. ___, 2007 WL 1773208, at \*4 (June 21, 2007) ("This Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission."); *see id.* at \*8 n.4 ("Nothing in the Act, we have previously noted, casts doubt on the conclusion 'that private securities litigation [i]s an indispensable tool with which defrauded investors can recover their losses' – a matter crucial to the integrity of domestic capital markets.") (citation omitted).

24

The Second Circuit has recently confirmed that counsel who creates a substantial benefit for a class is entitled to a commensurate award of fees. In *Wal-Mart Stores Inc. v. Visa U S.A.*, 396 F.3d 96, 122 (2d Cir. 2005), *cert. denied sub nom. Leonardo's Pizza by the Slice Inc. v. Wal-Mart Stores Inc.*, 544 U.S. 1044 (2005), the Court of Appeals noted that fees may be awarded under either the lodestar or percentage of the fund methods, but that "the trend in this Circuit is toward the percentage method." This is consistent with the line of cases in which the Supreme Court held that in the case of a common fund, the fee awarded should be determined on a percentage-of-recovery basis. *See Trustees v. Greenough*, 105 U.S. 527, 532 (1882); *Central R.R & Banking Co. v. Pettus*, 113 U.S. 116, 124-25 (1885); *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 165-70 (1939). In *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984), the Supreme Court stated that "under the 'common fund doctrine,' . . . a reasonable fee is based on a percentage of the fund bestowed on the class." This also is consistent with the trend of district courts within this Circuit to utilize the percentage of recovery approach when calculating attorneys' fees in common fund cases. *See, e.g., Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 370 (S.D.N.Y. 2002) ("the trend within this Circuit is to use the percentage of recovery method to calculate fee awards to class counsel" in common fund cases) (McMahon, J.); *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 127 F. Supp. 2d 418, 431 (S.D.N.Y. 2001) (same).

In his opinion in *In re Lloyd's American Trust Fund Litigation*, 96 Civ. 1262, 2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002), Judge Sweet, who awarded class counsel 28% of the settlement fund using the percentage method, noted:

The percentage method directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation, which clearly benefits both litigants and the judicial system. The percentage approach is also the most efficient means of rewarding the work of class action attorneys, and avoids the wasteful and burdensome process – to both counsel and the courts – of preparing and evaluating fee

petitions, which the Third Circuit Task Force described as "cumbersome, enervating, and often surrealistic."

*Id.* at *25 (quoting "Court Awarded Attorney Fees," Report of the Third Circuit Task Force (Arthur F. Miller, Reporter) *reprinted in* 108 F.R.D. 237, 258 (3d Cir. 1985)).[3] In addition, the PSLRA implicitly supports the use of the percentage of the fund method. *See* 15 U.S.C. § 78u-4(a)(6) ("[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class").

From a public policy perspective, the percentage method is the most efficient means of compensating the work of class action attorneys. It does not waste judicial resources analyzing thousands of hours of work, where counsel obtained a superior result. *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1296, 1306 (E.D.N.Y. 1985) (criticizing lodestar approach as one that "tends to encourage excess discovery, delays and late settlements, while it discourages rapid,

---

[3]    For many years, courts within this Circuit recognized that "Support for the lodestar/multiplier approach in common fund cases has eroded, and there has been a 'groundswell of support for *mandating* a percentage-of-the-fund approach' in the common fund cases." *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 397 (S.D.N.Y. 1999) (citation omitted, emphasis in original); *accord In re NASDAQ*, 187 F.R.D. at 465, 489 (S.D.N.Y. 1998) (chronicling and discussing strong support for percentage of recovery method). The trend among circuit courts is to utilize the percentage of recovery method, which has been expressly adopted in the vast majority of circuits (the First, Third, Sixth, Seventh, Ninth, Tenth, Eleventh and District of Columbia Circuits) as an appropriate method for determining an award of attorneys' fees. *See In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 305 (1st Cir. 1995) (permitting use of percentage method; "Contrary to popular belief, it is the lodestar method, not the [percentage] method, that breaks from precedent."); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 821-22 (3d Cir. 1995); *Gottlieb v. Barry*, 43 F.3d 474, 487 (10th Cir. 1994) (authorizing percentage and holding that use of lodestar/multiplier method was abuse of discretion); *Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560, 564-65 (7th Cir. 1994) (percentage approach is appropriate in common fund case); *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376-77 (9th Cir. 1993) (percentage approach appropriate); *Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 515-16 (6th Cir. 1993); *Swedish Hosp. Corp., v. Shalala*, 1 F.3d 1261, 1271 (D.C. Cir. 1993) ("a percentage-of-the-fund method is the appropriate mechanism for determining the attorney fees award in common fund cases"); *Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991) (percentage approach applicable).

26

efficient and cheaper resolution of litigation"), *aff'd in part, rev'd in part on other grounds*, 818
F.2d 226 (2d Cir. 1987); *accord Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 49 (2d Cir.
2000) (comparing lodestar analysis to "resurrect[ing] the ghost of Ebenezer Scrooge, compelling
district courts to engage in a gimlet-eyed review of line-item fee audits"). In addition, a
percentage method is consistent with and, indeed, is intended to mirror, practice in the private
marketplace where contingent fee attorneys typically negotiate percentage fee arrangements with
their clients. *See Am. Bank Note*. 127 F. Supp. 2d at 432 (citing *In re Sumitomo*, 74 F. Supp. 2d
at 397).

The fee request here is based on the percentage method because that is what Lead
Plaintiff chose as the method for determining the fees that Lead Counsel could seek. Since
passage of the PSLRA, courts have found such an agreement between fully informed lead
plaintiffs and their counsel to be presumptively reasonable. *In re Cendant Corp. Litig.*, 264 F.3d
201, 282 (3d Cir. 2001); *accord In re Lucent,* 327 F. Supp. 2d at 433-34; *In re Global Crossing
Sec. & ERISA Litig.*, 225 F.R.D. 436, 466 (S.D.N.Y. 2004) (Lynch, J.) (citing *Cendant* for the
proposition that "in class action cases under the PSLRA, courts presume fee requests submitted
pursuant to a retainer agreement negotiated at arm's length between lead plaintiff and lead
counsel are reasonable"). The Third Circuit stated in *Cendant* that passage of the PSLRA
"shift[ed] the underpinnings of our class action attorneys' fees jurisprudence in the securities
area." 264 F.3d at 276, 282.[4] And recently in *WorldCom*, Judge Cote found, "When class

---

[4]      *See also id.* at 276 (in enacting the PSLRA, Congress expressed its strong belief that an
institutional lead plaintiff would be in a better position than the court to protect the interests of
the class by monitoring lead counsel throughout the litigation and by negotiating a reasonable
fee for counsel's representation). As the Third Circuit in *Cendant* stated: "[U]nder the PSLRA,
courts should accord a presumption of reasonableness to any fee request submitted pursuant to a
retainer agreement that was entered into between a properly-selected lead plaintiff and a
properly-selected lead counsel . . . This presumption will ensure that the lead plaintiff, not the
court, functions as the class's primary agent vis-à-vis its lawyers." 264 F.3d at 282; *accord
Global Crossing*, 225 F.R.D. at 468 & n.16 (quoting Professors Geoffrey Miller of NYU Law

counsel in a securities lawsuit have negotiated an arm's-length agreement with a sophisticated lead plaintiff possessing a large stake in the litigation, and when that lead plaintiff endorses the application following close supervision of the litigation, the court should give the terms of that agreement great weight." *In re WorldCom, Inc. Sec. Litig.,* 388 F. Supp. 2d 319, 353 (S.D.N.Y. 2005). Indeed, in an earlier opinion concerning the first of the two fee requests in that case, Judge Cote noted that public policy considerations supported the award, as the lead plaintiff, a large public pension fund, had "conscientiously" supervised the work of lead counsel, and had given its endorsement to the fee request. *In re WorldCom, Inc. Sec. Litig.,* No. 02 Civ. 3288 (DLC), 2004 WL 2591402, at *20 (S.D.N.Y. Nov. 12, 2004). Here an experienced public pension fund was involved in all significant aspects of the prosecution and settlement of the Action, and negotiated a below-"benchmark" fee agreement after evaluating the actual efforts put forth, and the results obtained, by Lead Counsel.

Significantly, the percentage-based fees requested here also are fair and reasonable when measured against fees awarded in other cases. Indeed, in some cases that have resulted in settlements in the hundreds of millions of dollars, courts have awarded fees in the range of 25% of the recovery.[5] And, as this Court observed in approving the 33⅓% fee requested in *Maley,*

---

School and Arthur Miller of Harvard Law School, "both of whom have significant expertise in securities class action settlements and attorney fee awards," for the proposition that such fee agreements are "prima facie evidence of the reasonableness of a fee calculated according to its terms," and that such negotiations are "precisely the type of bargaining that the PSLRA anticipated and to which a court reasonably may give substantial deference"); *see also In re AT&T Corp. Sec. Litig.,* 455 F.3d 160, 169 (3d Cir. 2006) (affirming reasonableness of fees awarded by district court, and emphasizing that the presumption of reasonableness afforded to retainer agreements between properly selected lead plaintiffs and properly selected lead counsel does not diminish court's responsibility to closely scrutinize fee arrangements).

[5]    *See, e.g., In re Lucent Techs., Inc Sec. Litig.,* 327 F. Supp. 2d 426 (D.N.J. 2004) (17% fee awarded on recovery of $517 million); *In re DaimlerChrysler AG Sec. Litig.,* No. 00-0993 (KAJ) (D. Del. Feb. 5, 2004) (22.5% fee awarded on recovery of $300 million); *In re Oxford Health Plans, Inc. Sec Litig.,* MDL 1222, 2003 U.S. Dist. Lexis 26795 (S.D.N.Y. June 12, 2003) (28% fee awarded on recovery of $300 million); *see also Lucent,* 327 F. Supp. 2d at 439-41 (compiling

which settled for $11.5 million (in cash, a promissory note and equity) while motions to dismiss were pending. "Courts in this and nearby Districts have recently awarded 33⅓% in securities class actions where there has been a significant monetary recovery early on in the litigation." 186 F. Supp. 2d at 368 (citing cases). When judged against these awards, the actual fee request of 18%, negotiated after the results obtained were evaluated, is fair and reasonable.

### 2. The Requested Fees Are Reasonable as Measured by the *Grinnell* Factors

In determining a reasonable fee, the Second Circuit has advised courts to be guided by the traditional factors set forth in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974). As shown above, every one of those factors supports the fee request.

### 3. The Lodestar Cross-Check

The Second Circuit encourages the practice of performing a lodestar "cross-check" on the reasonableness of a fee award based on the percentage approach. The lodestar is calculated by multiplying the number of hours expended on the entire litigation by a particular attorney by his or her current hourly rate. The lodestar multiplier enhances the lodestar figure "by an appropriate multiplier to reflect litigation risk, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors." *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 466 (S.D.N.Y. 2004).[6] The lodestar here, through June 30, 2007,

_____

cases).

[6] The hourly billing rate to be applied is the hourly rate that is normally charged in the community where the counsel practices, *i.e.*, the "market rate." *See Blum*, 465 U.S. at 895; *Hensley v. Eckerhart*, 461 U.S. 424, 447 (1983) (Brennan, J., concurring in part, dissenting in part) ("market standards should prevail"); *Luciano v. Olsten Corp.*, 109 F.3d 111, 115 (2d Cir. 1997) ("[t]he 'lodestar' figure should be 'in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation'" (citing *Blum*, 465 U.S. at 896 n.11)). In addition, the Supreme Court and other courts have held that the use of current rates is proper since such rates more adequately compensate for inflation and loss of use of funds. *Missouri v. Jenkins*, 491 U.S. 274, 283-284 (1989); *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1153 (2d Cir. 1983) (use of current rates appropriate where services were provided within two to three years of fee application).

was $569,203.75. Stewart Decl. ¶ 56. This represents 1,334.75 hours expended by attorneys and paraprofessionals during the fourteen months of litigation in this case. *Id.* The requested fee would represent a multiplier of 2.43. *Id.*

Lead Counsel's approach resulted in an outstanding recovery for the Class now, rather than obtaining the same, or a lesser, or perhaps no recovery after incurring substantial amounts of time and resources and jeopardizing EVCI's survival. Given the Company's limited financial wherewithal and the wasting nature of its insurance policies, Lead Counsel maximized the Class's recovery. Accordingly, a lodestar multiplier of 2.48 is justified here, and is within the range found to be reasonable by courts that have used lodestar cross checks in complex class actions with outstanding results in the face of substantial risks. *See, e.g., Charter Comms.,* 2005 WL 4045741, at *18 (finding that a multiplier of 5.61 "falls within the range of multipliers found reasonable for cross-check purposes by courts in other similar actions, and is fully justified here given the effort required, the hurdles faced and overcome, and the results achieved"); *In re Rite Aid Corp. Sec. Litig.,* MDL No. 1360, 2005 WL 697461 at *2-3 (E.D. Pa. Mar. 24, 2005) (multiplier of 6.96); *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.* 364 F. Supp. 2d 980 (D. Minn. 2005) (multiplier of 4.7); *In re Cendant Corp. Prides Litig.*, 51 F. Supp. 2d 537 (D.N.J. 1999), *vacated and remanded*, 243 F.3d 722 (3d Cir.2001), *on remand*, No. 98-2819 (D.N.J. June 11, 2002) (multiplier of 5.28); *Di Giacomo v. Plains All Am. Pipeline*, Nos. H-99-4137, H-99-4212, 2001 WL 3463337 at *10 (S.D. Tex. Dec. 18, 2001) (multiplier of 5.3); *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 197 (S.D.N.Y. 1997) (multiplier of 5.5).[7] Thus, the

---

[7]    Lodestar multipliers of nearly 5 have been deemed "common" by courts in this District. *See In re NASDAQ*, 187 F.R.D. at 489 (Judge Sweet approving fee representing 14% of $1.027 billion settlement representing a multiplier of 3.97, and noting that lodestar multiples of between 3 and 4.5 are common); *In re Sumintomo Copper Litig.*, 74 F. Supp. 2d 393, 399 (S.D.N.Y. 1999) (awarding a 27.5% fee and finding multipliers of 3 to 4.5 to be common).

"cross-check" confirms the reasonableness of the percentage sought here. *See Maley*, 186 F.

Supp. 2d at 371.

### *B. Plaintiffs' Counsel Should Be Reimbursed For Expenses Reasonably Incurred In Connection With This Action*

Reimbursement of expenses to counsel to create a common fund is appropriate. *See In re*

*Arakis Energy Corp., Sec. Litig.*, No. 95 CV 3431, 2001 WL 1590512, at *17 n.12 (E.D.N.Y.

Oct. 31, 2001) ("Courts in the Second Circuit normally grant expense requests in common fund

cases as a matter of course"); *In re McDonnell Douglas Equip. Leasing Sec. Litig.*, 842 F. Supp.

733, 746 (S.D.N.Y. 1994); *Miltland Raleigh-Durham v. Myers*, 840 F. Supp. 235, 239 (S.D.N.Y.

1993) ("Attorneys may be compensated for reasonable out-of-pocket expenses incurred and

customarily charged to their clients, as long as they 'were incidental and necessary to the

representation' of those clients") (citation omitted). The Stewart Declaration (** 66-70)

summarizes that Lead Counsel incurred $51,268.27 in "reimbursable" expenses on behalf of the

Class in the prosecution of the Action. Of those expenses, 80% were incurred for Lead

Plaintiff's damages expert ($28,225) and for online legal and factual research ($12,658.12). The

expenses incurred were essential to the successful prosecution and resolution of this Action. The

expenses are reasonable and are approved.

### V. **CONCLUSION**

Lead Counsel should submit a form of judgment for entry by the Clerk of the Court,

whereupon this matter can be closed.

Dated: July 27, 2007

_____   _____   _____   _____

U.S.D.J.